The next case on our call this morning is agenda number seven, case number 104-181, People of the State of Illinois v. Robert W. Wear. Mr. Turpin, you ready to proceed? I am, Your Honor. All right, you may proceed. Good morning, Your Honors. Mr. Chief Justice, may it please the Court, my name is Elliot Turpin and I represent the defendant, Robert Wear, in this case. The Fourth District Appellate Court ruled that the police may make a warrantless, non-consensual entry to a residence whenever they set in motion in a public place, not an arrest, but an investigatory stop, or a Terry stop, if you will, and the suspect retreats inside the residence. The Appellate Court based its ruling on the decision of the United States Supreme Court in United States v. Santana. But in doing so, the Appellate Court improperly expanded the scope of the ruling in Santana in a manner that is inconsistent with Fourth Amendment principles. The United States Supreme Court has made it clear that the chief evil, that the physical entry of the home is the chief evil against which the Fourth Amendment is directed. And the Court has also held that searches and seizures inside the home are presumptively unreasonable if they are done without a warrant, and that the police bear a heavy burden whenever they try to demonstrate a circumstance that will excuse the requirement for a warrant. Now, the Appellate Court in this decision and the State in its argument have relied pretty much exclusively on United States v. Santana. But a review of United States v. Santana actually shows that the opposite result should have been reached in this case. As the Appellate Court held, and as the record clearly indicates, when Officer Dowdy entered the residence in question in this case, he entered it to make an investigatory stop, a Terry stop. He had set in motion a Terry stop before Mr. Ware went inside the house, not an arrest. Now, Santana deals only with arrests, not investigatory stops. And I think there are three passages from Santana that are particularly relevant to this point. First of all, the Court said the first question we must decide is whether, when the police first sought to arrest Santana, she was in a public place. The Court then went on to say the only remaining question, after they had answered that question in the affirmative, is whether her act of retreating into her house could thwart an otherwise proper arrest. And then you look at the ruling. The Court said we thus conclude. Now, Mr. Turpin, Santana happened to involve a felony, but it didn't make a ruling that a felony was required, did it? It did not. So you're extending that. You're extending the Santana case, saying that it can only involve felonies. I think, based on my argument that I've set out in my brief, Your Honor, I believe that the doctrine of hot pursuit would only apply to a felony. Santana did involve only a felony, but my position is also that Santana really only applies to arrests. If you read the Santana case, it's a very brief opinion. And what the Fourth District Appellate Court did in this case was say that, well, under Santana, any time any type of seizure is commenced outside, then if the suspect retreats inside, then he can, the police officer can go inside after him. But Santana only dealt with arrests. It gave no indication as to how it would rule in the case of an investigatory stop. And certainly what the Appellate Court did by saying any time there's a seizure, it's okay to go inside the house, certainly isn't supported by Santana. Because if you read Santana, the word seizure only appears in that opinion one time. And that is in a footnote when they were discussing who had standing to object to the seizure of the contraband in question. So our position on Santana is that essentially it applies only to arrests. I think it was limited by the mere fact that it was a case involving an arrest and nothing else. And they gave no analysis as to what types of seizures are allowed, what type of suspicion is required in order to engage in certain seizures. So I think Santana is, I certainly would agree that Santana is limited to felony cases, but I also would submit that it is limited to arrests and arrests only. You're indicating in this case, I think, that the police officer did not have probable cause until he got inside the home. Is that correct? He did not have, our position actually, Your Honor, is that he didn't have probable cause at all. But certainly our position is that if he ever did obtain probable cause, that it did not occur until after he had been inside the residence several minutes. Does not the record indicate that the officer testified that he had seen two or three traffic violations, that he had turned on his red lights and was attempting to pull the defendant over? Well, he certainly did. A couple of petty offense traffic violations, which, as he admitted, would not necessarily be an indication of intoxication. Yes, he did set in motion a traffic stop for those offenses, but those mere facts alone, Your Honor, do not establish probable cause for DUI. And they certainly don't establish probable cause and exigent circumstances in order to make a warrantless, non-consensual entry into the residence. Does that in any way change your argument with regard to Santana applying? If he could have arrested for the petty offenses or could have stopped? Well, in Santana, again, if this were an arrest, then you look at did the police set in motion an arrest outside. However, what you have to look at, though, is that the later cases of the United States Supreme Court have clearly held that a warrantless, non-consensual entry into a residence must be supported by probable cause and exigent circumstances. And further, as the United States Supreme Court held in Welsh v. Wisconsin, a civil, non-jailable petty offense traffic violation, even with probable cause and exigent circumstances, will not justify an entry into the home. There has to be a much more serious offense in place. And so, therefore, even assuming for the sake of argument that Officer Dowdy had probable cause for not using a turn signal and not stopping for a stop light or a stop sign, he certainly would not be authorized to go inside the house if Mr. Ware had exited his vehicle and he had told him to stop and Mr. Ware went inside the house. There has to be probable cause for a much more serious offense than a petty offense traffic case. Mr. Turpin, wasn't it true that Officer Dowdy traveled several miles before this ever happened, never tried to stop him? Whitehall is a very small town, Your Honor. Several miles would probably take you several miles outside of town. Based on my familiarity with it, I would say he might have traveled maybe a half a mile altogether from the very first time that they met at the edge of town until the time that Mr. Ware finally arrived at his destination. But again, you know, if you look at the testimony as to what happened during that period of time, even though quote-unquote hot pursuit does not have to be, as the U.S. Supreme Court characterized, a hue and cry about the public streets, this was not a case where Mr. Ware's vehicle was traveling in an erratic manner. This was a narrow, hilly, bumpy street. He was not striking parked cars. He was not going at an excessive rate of speed. He was not running pedestrians off the sidewalk. From all indications, it sounded like he was out for a Sunday drive. Well, I'm glad you ended with that because the facts do make a difference here, and the read on the facts is considerably different between the prosecution and the defense. Certainly. The officer testified, and that's why I'm going to go over just a couple of facts. Sure. The officer testified, I think, that their first meeting was when the defendant's car swerved toward the officer, which required him to move out of his lane. Correct. All right. And after that, he observed driving on the wrong side of the road. Okay. And after that, he observed him making an illegal left turn. I believe it was a right turn, actually. Right turn. But then he ran through a stop sign. Rolled through a stop sign, correct. So I think that that driving could be fairly characterized as erratic driving. I mean, I know you have an explanation for it, and later on we got to potholes. We all know there's a lot of potholes, but this is what the police officer saw. Sure. Right? And then he turned, before they got to the driveway, he turned on his emergency lights. The defendant didn't slow down. He turned into the driveway and got out of the car. Is that correct? That would be correct, Your Honor. The officer said at that time, it seems repeatedly, get back in the car, stop, stop now. Words to that effect. The defendant didn't respond. He went into the house, correct? He did. He turned and he looked back out the door, and he said words to the effect, I made it. Something to that effect, Your Honor. At some point, and I'm sure there will be a dispute as to this, at some point the officer smelled alcohol on the defendant's breath. Yes. When did that happen according to your reading of the record? Well, it kind of depends on who was asking the questions of the police officer. However, it does indicate on page 36 of the record, the officer testified, when he was inside the house, I had been up at the doorway is when I first made contact with him, and I could smell the alcohol coming from his breath then. So if you read that passage, he indicates that Mr. Ware was already inside the residence whenever Officer Dowdy smelled the odor of alcohol. Not necessarily inside the residence. I know it's splitting hairs, but that's the way it reads. It reads as if the officer is right at the doorway. And he did say that he was right at the doorway. Mr. Ware had gone inside, and Officer Dowdy was right at the doorway. So the officer, at least by one reading of that, could have been inches outside the door while Ware was inches inside the door. And that's the way I would read it, Your Honor. And that's when he smelled the alcohol.  And I think that was probably— Let me ask you this. Sure. I don't mean to cut you off. I want to give you all the time you can. That's fine. Wouldn't that give him probable cause on a DUI regardless of what he did? And I know what he did is he wasn't ready to pull the trigger yet. Right. But wouldn't an officer in that position have probable cause to arrest for the DUI? I don't feel that he would have probable cause. That would probably give him reasonable suspicion. Erratic driving and alcohol on the ground. Correct. Certainly reasonable suspicion, but not probable cause. And again, if you read the officer's testimony, it seems incredibly convenient to me that just a split second prior to the time that officer crossed the threshold of that house, that's where he smells alcohol. And so I think it's obvious— He has the credibility of this officer. He's also saying, which is very helpful to your argument, that he hadn't formulated the intent to arrest yet. That is correct. And he admitted that as well. Right. And for DUI, I really don't know how he could because these other incidents of driving, as you characterized it, Justice Fitzgerald, erratically, those, as he admitted, are things that could be totally innocent, have nothing to do with alcohol. And I think the strongest indicator that there might be a possible DUI here is that odor of alcohol. When did he smell that? After Mr. Ware was already inside. And as the police officer himself was going into the house. So I think it pretty well strains things to say that he had probable cause for DUI when he went into the house. What about the fleeing or eluding police? As far as that traffic offense, did he have probable cause for that? Or just the fact that Mr. Ware didn't stop? Following this man, he observed traffic violations, certainly going to the stop sign. The man refused to stop when he was told to do so and went in the house. But that could be for all kinds of reasons other than the person was drunk. I understand, but I'm looking through the eyes of the police officer at that moment. Well, that would certainly arouse his suspicion. If I were him, that would arouse my suspicion too. But the thing is, suspicion for what? Again, in order to justify this warrantless entry into the house, he would have to have probable cause and exigent circumstances. And probable cause for more than just petty offense traffic violation. If he's trying to justify the entry in this case, he would have to show that he had probable cause for DUI when he went in. What do you have to support your argument that the officer had to form the subjective intent to arrest before entering the threshold? Instead of it's sufficient that there's probable cause based on the objective circumstances. Where does this subjective intent come in anywhere? Well, subjective intent is generally not considered. I will acknowledge that. However, there are federal cases that have held that as far as whenever the officer is entering a residence without a warrant, that his subjective intent does become relevant. And additionally, the United States Supreme Court has held that ordinarily the probable cause determination is an objective factor. However, as far as whatever subjective intent is conveyed to the suspect, then it does become relevant. Perhaps not the most relevant factor, certainly, but if you look at the Mendenhall test for whenever a person is put under arrest, that is also an objective test based upon the circumstances of the case. If the defendant has been told, hey, you're under arrest, that is one of the things that he has to take into consideration in determining or we have to take into consideration in determining whether a reasonable person in his circumstances would feel that he was under arrest. Officer Dowdy indicated that he told Mr. Weir to stop. Mr. Weir testified that he never heard that. So the subjective intentions of the police officer have some limited relevance, but there is some relevance according to federal case law. Now, Justice Fitzgerald talked to you about the facts, and we're fully prepared, and that's why we took the case, to look at the legal argument as they're presented. But there is a theme running through the appellate court opinion as to how could the law be possibly any other way, and what I'm referring to is how I think Justice Appleton capsulizes the facts. This is a quote from their opinion. The defendant thought the enforcement of traffic laws resembled a children's game of tag, whereby the officer was it and defendant was safe if he reached home before the officer apprehended him. Is that really what happened here factually? I don't think so. I think that what happened was that this officer was confronted with a person that wouldn't stop for him, and he didn't really know what was the deal with him. In fact, I think he testified when I questioned him, and he indicated that he stopped and he wanted to check him out to see what the problem was. He didn't know what the problem was with him. And I think that when he went in, if you look at his testimony, he said he felt very uncomfortable going in, and he tried to get him to go outside to do those things that you would do on a traffic stop, get him to take field sobriety tests, get him to take a PBT, give him his identification, things like that. So I don't think it was merely a matter of Mr. Ware outrunning the police officer. In fact, I really don't know how he was able to accomplish this, quite frankly, because as I indicated in response to one of Justice Fitzgerald's questions, it looked like he was out for a Sunday drive. I don't know what took him so long to catch up with Mr. Ware. But the problem is that, again, you have to have both probable cause and exigent circumstances in order to enter the residence. Santana doesn't apply to this case, at least as far as to uphold the stop, because this was not an arrest. The police officer clearly had a suspicion when he went inside, but he certainly didn't have probable cause. If he had, then he certainly wouldn't have needed to get Mr. Ware to try to go outside to try to get him to take field sobriety tests. He didn't even know who this guy was, didn't have any ID on him, didn't have any information on him, didn't smell the alcohol until they were both going in the house. So I don't think that for DUI purposes you can say that he had probable cause. Additionally, I see my time is running short, but I want to hit on discussion of exigent circumstances. I believe Justice Freeman had a question. I'm sorry, Your Honor. Well, could the officer, I know this is a probable cause case, but could the officer also be responsible for making certain that evidence is not tampered with, smell of alcohol on the breath, blood level? A defendant retreating to his home could very easily grab a glass, come back out and say, what you smell on my breath is what I just had. Correct. I think there was such a case in Chicago, an accident in front of a tavern, and the guy goes into the tavern and drinks or orders five shots to get a receipt for it, and he pours it in this platoon, and already he's established that blood alcohol level was accumulated after the accident, not before. That's true. Or possibly, and I acknowledge there's also the argument in these cases, that if the defendant stayed inside long enough that his blood alcohol level would be dissipated, although I'm certainly not an expert in that. It could also go up, too. You never know. But tampering with evidence could be a concern of the officer. That could be a concern, certainly, although the state has never set that forth as a circumstance in this case, and the cases in Illinois have held, as I cited in my brief, that the possible destruction of evidence alone is not an exigent circumstance that will justify a warrantless entry. So, yeah, there is that concern possibly there, but even the state conceded at the trial level that that really wasn't what was going on here. The officer, again, testified that he was just on his way in the house. He, the officer, was when he first smelled that odor of alcohol. So until a split second before he went inside, he wasn't concerned about preserving an alcohol level because he didn't know that there was an alcohol level to be preserved, or at least on a reasonable examination of the facts, he certainly couldn't have made that determination. So, hot pursuit, I don't know if I really articulated this well enough in my brief, but we're asserting that either under U.S. v. Santana or any other case discussing hot pursuit, that hot pursuit, kind of like preservation of evidence, should not be considered as a means in and of itself, an exigent circumstance in and of itself, for three basic reasons. First of all, it's traditionally only been applied to felonies. Second of all, as the U.S. Supreme Court indicated in Welsh v. Wisconsin, an entry, even with probable cause and exigent circumstances, is not allowed for a minor offense, and if you have probable cause for a petty offense traffic case, that's not going to allow the police officer to go in. And third of all, what we need to look at in this case is that what happened inside. This was not a case like Santana, where the police just went inside, grabbed the guy, pulled him outside. They went inside the house and made a full-blown traffic stop, only it didn't occur at the side of a road. It occurred in my client's kitchen. He was in there for several minutes. This was a much more substantial intrusion than was the intrusion in United States v. Santana. And with that, if there are no further questions. I would just note that the Welsh case, the Wisconsin statute called for – didn't even call for jail time, right? Correct. Where the difference here would be up to 364 days in jail, right? That is correct. So there is that factual difference. That is correct, Your Honor. Thank you. Thank you, Mr. Turpin. Ms. Stotz? May it please the Court, Counsel. My name is Ritha Stotz. I'm with the Office of the Illinois Attorney General, and I represent the people of the state of Illinois. I'd like to start with the probable cause question. Essentially, Mr. Ware's argument seems to be that his driving could have been worse. Of course it could have, but that's not the question. Also, I think I have to disagree with the characterization of some of the evidence in the brief on the point of whether there were some obstructions in the road that would have required Mr. Ware to drive on the wrong side of the road. My reading of the transcript is that the attorney asking the questions of both Mr. Ware and Officer Doughty tried very hard to get both of them to testify that there were obstructions that would have required someone to drive on the wrong side of the road, but neither of them did that. What Officer Doughty testified was that there might have been bumps on the road, but that he was following right behind Mr. Ware and that he never needed to swerve to the opposite side. Mr. Ware, for his part, at a couple points in the testimony, gave a sort of colorful, detailed description of the road that he was driving on, but he never actually said that there was anything that required him to drive on the wrong side of the road. Instead, what he said was that he never did swerve or weave. So I don't really think the testimony at all supports the idea that any of this was necessary because of some sort of obstruction in the road. The facts of the trial court found established abundant probable cause for Officer Doughty to arrest for DUI even before he went into the house. Just briefly, it's 1 a.m., Officer Doughty is driving in a marked squad car when Ware, who is speeding, comes toward him, swerves into his lane, forces him off, running him off the road. Doughty follows directly behind. He sees Ware swerve and drive on the wrong side of the road. Then Ware turns without signaling, and as he does that, he crosses into the wrong side of the road again. At that point, Doughty puts on his flashing rotator lights on the light bar on top of his marked squad car, as well as his takedown lights, which are bright white lights that are attached to the light bar shining in front of the car, and his spotlights. But despite the flashing lights, Ware keeps driving for five or six more blocks. Doughty keeps following him. Ware swerves again, drives on the wrong side of the road again, and then he runs a stop sign and pulls into the driveway and starts staggering and stumbling toward the house. Doughty pulls in behind him with all of his lights still on, and as Ware is stumbling and staggering toward the house, Doughty orders him repeatedly, Stop. Get back in your car. Then Officer Doughty and Ms. Foyles and Mr. Ware meet at the doorway of the house. At this point, Officer Doughty's testimony is clear that while he is still outside the house, he smells a strong odor of alcohol on Mr. Ware's breath. Then Doughty says something like, I've been chasing you since Bates Street with my lights on and you refuse to pull over. Ware ignores him, walks into the house, just inside the doorway, and turns to face Doughty and says, I made it home. The appellate court correctly determined that this was plenty of probable cause for DUI. First, we have numerous traffic violations. The speeding, the failure to stop, the failure to turn signal, several instances of weaving and driving on the wrong side of the road, and, of course, running the police officer off the road. The traffic violations are not irrelevant. In some cases, maybe an isolated traffic violation could suggest carelessness or laziness on the driver's part just as much as it might suggest impairment. But that's not the case here because there are multiple violations because the type of driving is erratic and it suggests impairment. And also because the violations continue in the immediate presence of a marked police car when most people, if they're the sober but lazy driver who just fails to follow the traffic laws all the time, would immediately shape up as soon as the officer's there. And they would stop speeding. They would start signaling their turns and things of that nature. So there's multiple violations. There's the erratic pattern of driving. And in case there's any doubt that this is all suggestive of impairment, there's two physical signs of impairment. There's the strong odor of alcohol, which, again, was before Dottie entered the house. And there's the stumbling and staggering and the crossing of the feet as Ware tries to make his way toward the house. In addition, there's the flight. There's two circumstances of flight here. While Ware's driving, he flees from Officer Dottie's flashing lights. And then when he's on foot in the driveway, he flees again while Officer Dottie is repeatedly ordering him to stop and get back in his car. That shows consciousness of guilt. Ware's acknowledging that he's done something wrong. That's why he's running or he's moving at a slow speed, but he's evading the officer. Under Sibren, it's clear that that flight is strong evidence of minuserea and it's relevant to probable cause. Finally, and probably the most damning evidence, is Mr. Ware's own statement to Dottie that clears up any doubt that he knew he'd violated the law, that he knew Dottie was trying to stop him, and that he thought he could escape the consequences if he could make it into his house. And that's clear from his statement, I made it home. That's just before the officer gets into the house. And technically, for the suspension context, the real question is probable cause at the time of the arrest, which actually occurs inside. There's a couple more pieces of evidence, which really don't matter because we already have probable cause, but just to outline what those are. Once the officer is inside, Ware refuses field sobriety. He says it hasn't helped him in the past. He refuses to provide identification. He admits that he's been drinking and he resists being handcuffed. Now, Mr. Ware says that there's numerous cases that support the proposition that this was not probable cause. He's only cited three, and none of them really support that proposition. He cites Tucker and O'Brien. Both of those were cases where the trial judge discredited the arresting officer. So, of course, there was no evidence of probable cause at all. And then he also cites the Marks case, and that's distinguishable because that was really just traffic infractions. And here, of course, we have more. We've got erratic driving, traffic infractions in the presence of the officer. We have flight. We have the statement. And we have two physical symptoms of impairment. So I think the probable cause question is really not even a close one. Unless the court has questions about any of the facts, I'll move on to the Santana question.  If the probable cause is somehow relevant to the suspension question, the suspension should still stand because the entry was proper under Santana. This case is very similar to the facts of Santana. What happened in Santana is the police have probable cause to arrest Santana for drug dealing. They drive up to her house, and she is standing right in the doorway, which the court holds is actually a public place. They pull up, and as they approach getting out of their cars, all they do is display their identification and yell, police. In response to that, Santana retreats into the vestibule just inside the house, so she's now in a private place. And what the court held was that a person cannot thwart what would have been a permissible public place seizure by ducking into a private space. If they do that, the officer can go in to get them. That's exactly what happened here. First, Officer Dottie had probable cause before he ever went into the house, just like the officers did in Santana. Second, he signaled to Ware that he was attempting to seize him. Just the way the officers in Santana yelled police and showed their identification, Dottie gave clear signals that he was trying to seize Ware. He had his flashing lights on for five or six blocks, and then he yells at him repeatedly, stop, get back in your car. Finally, just as in Santana, Ware responds to these lawful orders to stop by retreating into a private place. When he does that, Dottie is free to follow him in to effect the seizure. Mr. Ware doesn't have any support for the idea that the Santana principle is limited to felonies. He has a lot of dicta that says Santana permits an entry for hot pursuit of a fleeing felon, which of course is true, but none of those cases say anything about Santana not applying to fleeing misdemeanors. And a lot of the cases that he discusses as hot pursuit cases, they're not really Santana cases. So I think that those categories should be kept separate. A lot of the cases that Ware talks about as hot pursuit cases are not Santana cases in that they're not situations where the person, the suspect is outside, the officer has probable cause, and the officer makes some sort of a move to effect a seizure. So just to say, so cases just where the crime has been committed recently, some cases call that hot pursuit. But that's really different from the Santana scenario. The way we're describing it, the Santana scenario requires that the officer gives some kind of outward signal that he's trying to seize the suspect while the suspect's outside, then the suspect goes inside. That's the Santana rule, and that's what this case falls squarely within. Would it apply to petty offenses? The court wouldn't have to go that far here because there's at least a misdemeanor and there's also probable cause for obstruction of justice, which is a felony. But it logically should apply to misdemeanors because Santana is really just a very slight extension of the public place exception to the warrant requirement. Thunder Watson says, if the officer has probable cause, he can arrest the suspect in a public place without getting a warrant. And it's clear from Atwater v. Lago Vista that that rule applies all the way down to petty offenses. In that case, it was a seat belt offense that was only punishable by a fine. So to the extent that Santana just builds on the public place exception to the warrant requirement and just extends it slightly by saying, if the officers are making a permissible public place arrest and the suspect goes inside, the officer can follow, Santana should apply to the same extent that the public place exception to the warrant requirement does. So it should extend to petty offenses. Counsel, could you clarify for me, did the officer at the doorway have already articulated a thought about arresting the defendant or is he still investigating, as Mr. Turpin says? He did say that he did not finally decide to arrest him, I think, until after he was inside. But that's really irrelevant. The officer's intentions, thoughts, feelings, purposes, all of that is always in the Fourth Amendment analysis. Then how would he then articulate a probable cause? At what point? I'm sorry, I'm not sure I understand. Tell me about probable cause then. How would there be a probable cause if he didn't have some idea of what the officer was thinking or intending to do? I'm not sure I'm following. The probable cause is just based on what the officer knows. And our position is that to come within Santana, the officer has to articulate some or to give the suspect some outward sign that I'm trying to seize you. So he doesn't have to say I'm trying to arrest you or I'm trying to stop you. That didn't happen in Santana either. All that happened was the police flashed their badges and yelled police. And it was clear from what they did and from Santana's response that she knew they were trying to seize her. And whether it ultimately turned out to be a Terry stop or an arrest really is irrelevant because, one, the officer had probable cause, and that's the amount of evidence that would justify either type of seizure. And, two, either type of encounter would start the same way, and the intrusion would be the same from the suspect's perspective. I mean, whether he was intending to arrest him or stop him, he turns on the lights and yells stop. That could have ended up in him being handcuffed and taken into custody or not. So I'm not sure if I'm addressing your question, though. Weir's argument that the officer's intent is relevant is, as we mentioned, it's not supported by any Supreme Court law. The Supreme Court says intent is always irrelevant. Then he cites some cases that say, well, intent is relevant to the extent it's communicated. Well, that supports our position. If it's communicated, it's really not intent, then it's outward actions. And, of course, we're agreeing that the outward actions are relevant. But it's never going to be necessary to determine whether a particular police citizen encounter is a Terry stop or is actually an arrest unless the officer only has reasonable suspicion. That is, unless he can't justify the arrest, only the Terry stop. If the officer has probable cause, it never matters what type of thing it is. He can do either as long as he had probable cause. And he had probable cause here. Just one other point about Weir's argument based on Officer Doughty's intent. Did he intend to arrest him or did he intend to stop him? It seems to put him in an awkward position, as we explained in the brief. He seems to be conceding that if an officer has probable cause to arrest a suspect and he attempts to seize him and the suspect flees inside, the officer can go in, but only if he's planning to arrest him. And the exact same set of facts, he seems to be saying the officer can't go in if he's planning to Terry stop him. That seems to be saying that the officer would be violating his constitutional rights by doing the exact same thing just based on what he was thinking. And that doesn't really make any sense. The officer's thoughts can't violate a suspect's constitutional rights. And he doesn't have a, and he also seems to be suggesting that, well, the officer should have arrested him outside. But he doesn't have a constitutional right to be arrested at all. So the argument really doesn't make sense. It all seems to turn on what the officer is thinking, which is really irrelevant. I'll move on to the exclusionary rule question. First, there's just a couple of forfeiture and waiver points that come up based on the reply brief. First, the reply criticizes the state for responding to the exclusionary rule argument and says we've missed the point. Our point was to respond to Mr. Ware's argument made in his opening brief. His opening brief, he discussed the legality of the entry, and the only way he linked that up with the suspension proceeding was to argue that the exclusionary rule applied. So to the extent we address that question, we're just responding to his argument. He also says in the reply brief that we conceded in the appellate court that the exclusionary rule applies to suspension proceedings. That's not true at all. We did not concede that. The question about the applicability of the exclusionary rule to suspension proceedings first came up in this case in the appellate court's opinion. The appellate court constructed an argument on Ware's behalf that Ware could have raised as an alternate ground for affirmance but did not actually raise. And then in the context of discussing that argument, the appellate court said something like, the parties don't dispute that the exclusionary rule applies. And that's technically true, but it's a little bit misleading. We didn't dispute it because Ware had never argued that it did apply. He didn't argue that in the trial court or in the appellate court. Our briefs in the appellate court discussed the legality of the entry, but that was only because at the appellate court level, the criminal case was still at issue. In the appellate court, we were disputing both the rescission proceeding, the suspension of the license, and we were also disputing the suppression ruling that took place in the criminal case. So, of course, we were addressing the legality of the entry because it was relevant to the suppression issue. That issue is now dropped out because the appellate court concluded that we actually dismissed the criminal case. Mr. Ware is actually the one who forfeited the exclusionary rule argument because he didn't make it in the trial court. Even where the exclusionary rule applies, it's never self-executing. The litigant who wants to take advantage of it has to file a motion to suppress, asking to suppress certain evidence, explaining how it flows from a particular constitutional violation. He didn't do that in the trial court. That's why the argument is forfeited. Also, in the reply brief, Ware seems to raise a new, different argument. He seems to sort of take back the exclusionary rule argument and say, well, it's not really about the exclusionary rule. It's really about this other question of whether, if the officers violate the Fourth Amendment in any way, that somehow enables the suspect to avoid a summary suspension. That argument was first raised in this court in the reply brief. We haven't had a chance to respond, so I would ask the court to deem that argument forfeited. As for the merits of the exclusionary rule argument, a majority of jurisdictions that have addressed the question seem to have sided with the state and held that the exclusionary rule does not apply. We submitted a motion for leave to cite additional authority with this court a couple of days ago. We cited cases from 11 states. I've since found one more that I'll be filing. Mr. Ware has a sort of a long string side of his own that seems to, that he suggests sort of supports his position that the exclusionary rule should apply. Most of those cases don't actually support his position. There are a couple of states that have held that. But of the cases he cites, one is not related at all because it was based on the Vermont Constitution, which is broader than Illinois'. Counsel, if I may. Maybe you can help me out. I'll have the same question to counsel. Exclude what from where? That's the other problem. It's entirely unclear. It's entirely unclear how this argument would work. The only way that it was... Go ahead. I'm sorry. Go ahead. The statutory petition for statutory, to rescind the statutory summary suspension is a hearing in its own. It's not a hearing to decide whether evidence is excluded and not used not to be considered. So if I read both briefs about exclusion, I'm left with the question, exclude what from where? That's just one of the many logical problems with this argument. First, it's a civil proceeding. But let me just ask this. Is the question, does a Fourth Amendment violation result in a, resulting in what counsel would say was a bad arrest, give grounds to rescind the statutory suspension? Is that what we're talking about when we're talking about? That's the argument framed in the reply brief. And if the court's saying, well, that's really the same as the argument he raised in the first case, it may be they're kind of murky and I can't really tell. Thank you. Just about the cases. If you could just wrap up. I'm sorry. I would just ask the court to affirm the judgment of the appellate court and to use the supervisor authority to clarify for the lower courts that the exclusionary rule doesn't apply in suspension proceedings. Thank you, Ms. Stutz. Rebuttal, Mr. Turpin. Thank you, Your Honor. To get to Justice Fitzgerald's question first, exclude what from where. I kind of feel like I might have sent everybody down a rabbit hole on this when I cited that one sentence in Kruger that says that a summary suspension hearing sort of acts like an exclusionary rule. The question is exclude from what from where? No. In an implied consent proceeding, we're not talking about excluding evidence. But if you read the plain language of the statute, at the conclusion of the hearing on a statutory summary suspension petition, the court has to decide whether to sustain or rescind the statutory summary suspension. And the Fourth Amendment is directly implicated because one of the issues that can be addressed in a petition to rescind statutory summary suspension is were there reasonable grounds for the arrest? Reasonable grounds, as we all know, means probable cause. Where does probable cause come from? The Fourth Amendment. For over 20 years, the courts in this state have been addressing whether an arrest was legal under the Fourth Amendment. And where they've found that it is not, then the statutory summary suspension has been rescinded. When the case goes up on appeal, the court determines whether under the Fourth Amendment the arrest was legal or not, and therefore whether the trial court's decision on this was correct. So that is what we're talking about when we talk about the exclusionary rule. It's not an exclusion. It really isn't. It's just principles of a motion to suppress the statutory summary suspension. Exactly. The whole thing is does the Fourth Amendment analysis of a legal arrest apply to an implied consent hearing? And according to the plain language of the statute, according to the Illinois case law, including this court's decision in People v. Smith, and as recently as February 13th of this year in a second district appellate court opinion, in People v. Wood, that issue is directly implicated. So, no, it's not whether we're trying to keep evidence out. It's just does the legality of the arrest or illegality of the arrest either sustain or cause to be rescinded the statutory summary suspension. To address the state's argument as to the general merits of the case under the Fourth Amendment, the state relies on two things. Number one, the assertion that there is probable cause, which we each have our own opinions on that, and United States v. Santana. That's it. That's the only thing they're relying on. There's no discussion in their brief as to People v. Foskey. There's no discussion as to exigent circumstances. I don't even know if the phrase exigent circumstances even appears in the argument of their brief. But probable cause is only half the equation. You can't look at just probable cause. You have to look at the possibility of exigent circumstances. Again, you can't just simply rely on Santana because that was a case that simply involved an arrest, not an investigatory stop. And, again, the problem with the Fourth Amendment's decision in this case was that the Fourth Amendment says any time the police try to make a seizure of any kind outside and the suspect retreats inside, then the police officer is allowed to go inside after him. That is not an accurate statement of the law because if there is a Terry stop simply based on reasonable suspicion, then that does not arise to the level of probable cause that allows a police officer to go inside. The U.S. Supreme Court has been very clear and very adamant that probable cause is required to support any type of warrantless entry to a house. So the problem with this case, the Fourth District's decision, is not just a problem for my client, but it's a problem for future cases looking at precedent. And they look at the Fourth District's opinion and say, well, I guess if there is reasonable suspicion for a traffic stop for a DUI and the guy doesn't stop for the police officer, I guess the police officer can go on inside. And the United States Supreme Court simply would not support that. There was no exigency in this case. As this court stated in People v. Foskey, in order to support a finding of an exigency, there must be a clear and immediate danger to the police or others in the area. There may have been what can technically be called a hot pursuit. Again, I've indicated before, I've used the phrase Sunday drive. That's about what this following was. But in any event, there was no danger in the defendant's driving. He wasn't driving out of control. He wasn't hitting parked cars. He wasn't mowing over pedestrians. It was the middle of the night. Nobody else was around. He was driving slowly. His driving might not have been the best, but it certainly wasn't any danger to anybody in the area. And the fact that there may have been what the courts may call a hot pursuit, that in and of itself does not indicate that there is any clear and immediate danger to anyone. In fact, even though driving under the influence is obviously not a good idea, it's a serious problem, it's a dangerous thing to do. However, a motorist who is under the influence is really only a danger to other motorists. Once he gets home, once he gets inside his house, that danger has been eliminated. And for that reason, the police under Stegall v. United States, under this court's decision, people versus white, would be authorized to post guards at the door while the main police officer went and got a warrant. If the suspect did step outside. That brings us back to Justice Freeman's earlier question. While the time that's going on, the evidence is dissipating. Well, if there is only reasonable suspicion, then the police officer didn't have any business going in the house in the first place. But if there's probable cause, he does? As the courts in this state have held, the destruction or possible destruction of evidence in and of itself is not a reason, is not an exigent circumstance in and of itself that justifies entering the house. Is the determination of probable cause, counsel, critical to your prevailing in this case? In other words, if we find there is probable cause, would we be ruling the other way? If the court doesn't find probable cause, then the entry was not authorized, period. If the court does find probable cause, then that's the first question. The second question is, were there exigent circumstances? And that is the basis of the argument I've just been making. There was no arrest, like there was under Santana. And again, talking about intent, let's ignore the officer's intent. Let's look at what he did when he went inside. He did not take any steps to make an arrest until after he had asked a number of questions of Mr. Ware. So if you leave aside his intent, his actions indicated that he did not go inside to make an arrest. He just went inside to make a tariff stop. Well, the appellate court would dispute the exigent circumstances and talk rather in terms of just hot pursuit, right? Yes, exactly. In fact, I think they expressly disagreed with the 5th District's decision in Lagle as to hot pursuit being merely a factor. It's our position, for the reason I've stated here earlier, that hot pursuit is kind of one of those things that's like destruction of the evidence. It's a factor to take into consideration, particularly if you look at the factors this court set out in Foskey. One of the very first factors was, was the offense recently committed? If there is hot pursuit, then obviously that offense was recently committed. That's a thing to take into consideration. It doesn't automatically authorize the entry. And finally, with respect to the intrusion into the house, I think it can be very reasonably argued, in fact it is our position that the intrusion in this case was much more serious and much more lengthy and much more substantial than that in United States v. Santana. Look what happened in Santana. The suspect stepped inside, the police officer stepped inside one or two steps, grabbed ahold of him, put him under arrest. That was it. That might have taken 15 or 20 seconds. Under the testimony in this case, the officer went inside, was inside and interrogated Mr. Ware for several minutes and didn't make the determination to put him under arrest until after he had already gone through all these things that you do on a traffic stop. Now, a Terry stop might be less of a substantial intrusion when it takes place out in your driveway. But as this case illustrates, it's a much more substantial intrusion when it takes place in your kitchen. So are there any other further questions? Apparently not. Thank you, Mr. Turpin. Thank you, Mr. Stotz. Case number 104181, People of the State of Illinois v. Robert W. Ware, is taken under advisement as agenda number seven.